IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ICORE MIDCO INC., a Nevada
corporation; ICORECONNECT INC., a
Delaware corporation,

        Plaintiff,

vs.

PIGI SOLUTIONS, LLC, a Delaware
limited liability company, and JOHN
SCHNELLER, an individual,

        Defendants.

_____/

CASE NO. 6:25-CV-600

TIME-SENSITIVE RELIEF
REQUESTED

**TIME-SENSITIVE MOTION FOR EX PARTE TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs, ICORE MIDCO INC., a Nevada corporation ("ICCT"), and

ICORECONNECT INC., a Delaware corporation ("ICCT Parent"; and together,

"Plaintiffs"), pursuant to Rule 65 of the Federal Rules of Civil Procedure, move *ex*

*parte* for issuance of a temporary restraining order ("TRO") without notice, and for

a preliminary injunction, to enjoin Defendant PIGI Solutions, LLC ("PIGI") from

conducting an auction sale purportedly of substantially all of Plaintiffs' assets

scheduled to conclude on **April 25, 2025**, and in support submits the Verified

Complaint filed herewith (the "Complaint"), and the Declaration of Robert

McDermott attached hereto as **Exhibit A** (the "McDermott Declaration"), and states as follows:

<div align="center">

**SUMMARY OF TIME-SENSITIVE RELIEF SOUGHT**

</div>

Plaintiff requests the Court issue a temporary restraining order and preliminary injunction to prevent PIGI, a purported secured creditor, from continuing a UCC auction and disposition of substantially all of Plaintiff's assets. The auction is already underway, within initial bids due on April 11, 2025, and set to conclude on or around **April 25, 2025**, when final bids are due. It is imperative that the Court enjoin the auction as quickly as possible to prevent the imminent irreparable harm that will befall Plaintiff if it continues or concludes, which is nothing short of the complete destruction of its business. PIGI has *no* right to conduct an auction of ICCT's assets under the applicable provisions of the Uniform Commercial Code because **ICCT never granted PIGI a lien and security interest on its assets**. Additionally, as set forth below and in the Complaint, the underlying security agreement executed by ICCT Parent is void for illegality and subject to rescission as the product of fraud. **Because the auction is ongoing, Plaintiffs request the Court issue a TRO as soon as practicable and before initial bids are due on April 11, 2025.** In the event the Court denies Plaintiffs' request for TRO, Plaintiffs will need to take other legal action(s) to prevent the auction from concluding on April 25, 2025.

<div align="center">

2

</div>

## BRIEF FACTUAL BACKGROUND

As detailed in the Complaint, the verified allegations of which are incorporated herein by reference, ICCT and PIGI are parties to a certain Finder's Fee Agreement.[1] Under the Finder's Fee Agreement, PIGI provided securities and investment advice and "finder" services to ICCT to locate a partner for a business transaction (e.g., a reverse merger). In the Finder's Fee Agreement, PIGI represented and warranted that it was registered with the Financial Services Regulatory Authority ("FINRA"). However, ICCT recently learned that this representation was false, and that PIGI has *never* been registered as a broker-dealer with FINRA or the SEC, contrary to Section 15(a) of the Securities and Exchange Act of 1934 (the "Exchange Act").

PIGI's services under the Finder's Fee Agreement constitute broker-dealer services that require registration with FINRA under Section 15(a) of the Exchange Act. Because PIGI was *not* registered with FINRA as a broker-dealer, the Finder's Fee Agreement—and all subsequent agreements between the parties relating thereto—is voidable under Section 29(b) of the Exchange Act. Accordingly, Plaintiffs file the Complaint, in part, to seek a determination that the Finder's Fee Documents are all void, and for rescission of same.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Complaint.

Additionally, unbeknown to ICCT at the time it entered into the Finder's Fee Agreement, one of ICCT's directors, Defendant John Schneller ("Schneller"), entered into an agreement with PIGI and its owner, Peter Wright ("Wright") to receive 50% of the fees due under the Finder's Fee Agreement. While Schneller was a Director of ICCT, he introduced PIGI and Wright to ICCT's President, Robert McDermott, and advocated for ICCT to engage PIGI through the Finder's Fee Agreement. At no point prior to entry into the Agreement did Schneller ever disclose his 50% interest in the finder's fee. Schneller is not a registered agent with FINRA or the SEC. Schneller's omission of his interest in the finder's fee, and PIGI's false representation regarding its registration with FINRA, give rise to ICCT's claims for rescission under Sections 15(a) and 10(b) of the Exchange Act, Chapter 517, Florida Statutes, and under common law for fraudulent inducement into the Finder's Fee Agreement.

At the Merger (as described in detail in the Complaint, ¶¶ 26-29), ICCT was merged with and into FG Merger Sub Inc., a Nevada corporation, which then changed its name to iCore MidCo Inc., a Nevada corporation. ICCT remains the operating company that continues to hold all valuable software and intellectual property rights. ICCT Parent owns 100% of ICCT's issued and outstanding stock interests.

4

After ICCT completed the Merger in summer of 2023, PIGI sent ICCT an invoice for over $2.0 million for its services rendered under the Finder's Fee Agreement. When ICCT could not pay the invoice, PIGI required ICCT Parent—but not ICCT—to sign the Note, Loan Agreement, and Security Agreement, pursuant to which ICCT Parent granted PIGI a subordinated lien and security interest in all of its assets.[2] However, ICCT did not sign the Security Agreement or any other agreement granting PIGI a lien on its assets.

On March 10, 2025, PIGI noticed an auction sale of all of ICCT and ICCT Parent's assets, ostensibly pursuant to the provisions of Del. UCC § 9-613 and NRS 104.9613, to be conducted on or after May 9, 2025, based on an alleged "default on debts owing to PIGI in the amount of $2,434,243 in principal and accrued interest." Complaint, Ex. G. However, on April 1, 2025, PIGI sent Amended Notices of Sale that state ICCT and ICCT Parent's property will be sold by public auction conducted "on-line with a winner [sic] bidder to be selected on **April 26th, 2025** at 5:00 p.m. EST at 280 Hillside Avenue, Needham MA," with the closing of the sale to occur on or after May 9, 2025. Complaint, Ex. I. The Sale Information Documents disseminated by PIGI state that the online auction is already underway, that initial

---

[2] Although not raised here, ICCT Parent reserves the right to assert that these documents are unenforceable or void due to lack of consideration. ICCT Parent had no obligation to PIGI under the Finder's Fee Agreement, and receiving no value in exchange for executing the Note, Loan Agreement, and Security Agreement.

bids are due by **April 11, 2025**, and final bids are due **April 25, 2025** at 8:00 p.m. EST (the "Auction"). The auction is being conducted by Dealgen Partners ("Dealgen"). Complaint Ex. H.

## MEMORANDUM OF LAW

Plaintiffs request this Court enter a temporary restraining order without notice to PIGI or a hearing, and a preliminary injunction after an evidentiary hearing, enjoining PIGI and its agent, Dealgen, from continuing or concluding the Auction. "The purpose of a temporary restraining order, like a preliminary injunction, is to protect against irreparable injury and preserve the status quo until the district court renders a meaningful decision on the merits." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005) (citation omitted). The standards for granting both a temporary restraining order and a preliminary injunction are the same. *Gissendaner v. Comm'r, Ga. Dep't of Corr.*, 779 F.3d 1276, 1280 (11th Cir. 2015). A plaintiff is entitled to preliminary injunctive relief if it shows through evidence: "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). Under Federal Rule of Civil Procedure 65(b)(2), a TRO "expires at the

6

time after entry—not to exceed 14 days—that the court sets, unless before that time the court, for good cause, extends it for a like period or the adverse party consents to a longer extension." Fed. R. Civ. P. 65(b)(2). A pending hearing for a preliminary injunction can constitute good cause.

"Given [the] limited purpose [of a temporary restraining order and a preliminary injunction], and given the haste that is often necessary ..., [they are] customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). "Because [the] proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards, district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated and remanded on other grounds*, ––– U.S. –––, 137 S. Ct. 1239, 197 L.Ed.2d 460 (2017).

As set forth below, Plaintiff has satisfied its burden of persuasion on each element required for issuance of a TRO without notice and a preliminary injunction order.

### A.    ICCT is likely to succeed on the merits.

ICCT has met this standard with respect to the claims giving rise to preliminary injunctive relief, namely its claims to declare the Finder's Fee Documents void for illegality in violation of the Securities Exchange Act and the Florida Blue Sky Laws (Counts I and II), for rescission of such documents because they were procured by fraud (Counts III, IV, and V), and for declaratory relief (Count IX). Under any of these counts, the Finder's Fee Documents are likely to be found void for illegality or as the product of fraud, and the Court is likely to declare that PIGI does not hold any security interest on ICCT's property.

> i.    **PIGI has no right to dispose of ICCT's property because it does not hold any security interest on ICCT's property.**

Under the Uniform Commercial Code as enacted in the State of Nevada, where ICCT is incorporated, a security interest attaches when (1) value has been given, (2) the debtor has rights in the collateral or the power to transfer rights, and (3) the debtor has authenticated a security agreement describing the collateral, or the secured party has possession or control of the collateral. NRS 104.9203(2); *see also McCorquodale v. Holiday, Inc.*, 518 P.2d 1097, 1098 (Nev. 1974). A security interest in personal property can then be perfected by filing a UCC-1 financing statement with the Nevada Secretary of State. NRS 104.9310.

Because ICCT never signed (or "authenticated") a security agreement granting PIGI a security interest on its property, no security interest on ICCT's assets ever attached to its assets. PIGI's NV Financing Statement filed on January 14, 2025,

8

was ineffectual and failed to perfect any security interest on ICCT's property and assets. Therefore, PIGI has no right to dispose of ICCT's property under NRS 104.9601. PIGI is attempting to conduct an auction of property that does not constitute its collateral and is not subject to a perfected security interest. ICCT therefore has a strong likelihood of success on its request for declaratory relief to determine that PIGI does not hold any security interest in ICCT's assets, and that injunctive relief is appropriate to stop PIGI from taking further unlawful action as a purported secured creditors (i.e., Count IX).

To be sure, ICCT Parent did not, and could not, grant PIGI a lien and security interest on ICCT's assets. ICCT is a separate legal entity with its own board of directors and officers. ICCT Parent has no rights in ICCT's property simply by virtue of holding 100% of ICCT's stock. It therefore could not have granted a security interest to PIGI in ICCT's assets that would constitute "attachment" under NRS 104.9203. Moreover, even if ICCT Parent could grant a security interest in ICCT's assets, the terms of the Security Agreement do not include ICCT's assets in the description of "Collateral." Security Agreement, § 1(a)(i) (definition of "Collateral"). PIGI simply does not maintain any security interest on ICCT's assets.

### ii.    The Finder's Fee Documents are voidable for illegality.

Section 15(a) of the Exchange Act states that it is unlawful for unregistered brokers to "effect any transactions in, or to induce or attempt to induce the purchase

9

or sale of, any security." 15 U.S.C. § 78o(a)(1). A "broker" is defined as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). The Florida Blue Sky Laws statutes mirror the Exchange Act. *See* Fla. Stat. §§ 517.12 and 517.211(1).

"The broker-dealer registration requirement serves as the 'keystone of the entire system of broker-dealer regulation'" and "[a] broker-dealer that has registered with the [Securities and Exchange] Commission is bound to abide by numerous regulations designed to protect prospective purchasers of securities, including standards of professional conduct, financial responsibility requirements, recordkeeping requirements, and supervisory obligations over broker-dealer employees." *Roth v. SEC*, 22 F.3d 1108, 1109 (D.C. Cir. 1994); *see also, e.g.*, FINRA Rule 2010; FINRA Rule 2210(d)(1); FINRA Rule 4513.

"The requirement that brokers and dealers register is of the utmost importance in effecting the purposes of the [Exchange Act]." *EdgePoint Cap. Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50, 58 (1st Cir. 2021) (quoting *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968)); *see also Roth*, 22 F.3d at 1109; *Turbeville v. FINRA*, 874 F.3d 1268, 1270 (11th Cir. 2017) (explaining that the Exchange Act requires registered brokers to comply with "conduct rules 'designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, . . . [and] to protect investors and the public

10

interest.'" (quoting 15 U.S.C. § 78o-3(b)(6))). "It is through the registration requirement that some discipline may be exercised over those who may engage in the securities business and by which necessary standards may be established with respect to training, experience, and records." *Eastside Church of Christ*, 391 F.2d at 362. Registration ensures that sellers of securities "understand[ ] and appreciate[ ] both the nature of the securities [they] sell[ ] and [their] responsibilities to the investor[s]." *Roth*, 22 F.3d at 1109.

"An entity 'attempts' to induce the sale of securities and therefore must register when it publishes advertisements for securities or contacts potential buyers to solicit investment." *EdgePoint Cap. Holdings*, 6 F.4th at 58; *see also, e.g.*, *SEC v. Nutra Pharma Corp.*, 450 F. Supp. 3d 278, 291 (E.D.N.Y. 2020) (holding that the SEC adequately alleged a violation of Section 15(a) where its complaint stated that defendant had "induced or attempted to induce the purchase or sale of securities by calling investors, mailing invitations to promotional events, and attending dinners and lunches and making promotional pitches"); *SEC v. Schmidt*, No. 71 Civ. 2008, 1971 WL 293, at *1–2 (S.D.N.Y. Aug. 26, 1971); *In re First Cap. Funding, Inc., Exchange Act Release No. 30,819*, 50 SEC 1026, 1027–28 (June 17, 1992) (explaining that transmitting a "pre-qualification form" to potential investors describing investment opportunity and including "language of solicitation" was an attempt to induce the purchase or sale of securities).

Section 29(b) of the Exchange Act states that:

> Every contract made in violation of any provision of this chapter . . . and every contract . . . the performance of which involves the violation of or the continuance of any relationship or practice in violation of, any provision of this chapter . . . shall be void . . . as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract."

15 U.S.C. § 78cc(b). Section 29(b) does not immediately void the contract at issue; instead the contract is "voidable at the option of the innocent party." *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387–88, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

"A party seeking to void a contract under Section 29(b) must show (1) that it is in contractual privity with the opposing party, (2) that it is within the class of people that the securities acts were designed to protect, and (3) that the contract involved a prohibited act." *EdgePoint Cap. Holdings*, 6 F.4th at 59 (citing *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 205 (3d Cir. 2006); *Reg'l Props. Inc. v. Fin. & Real Est. Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982). "Section 29(b) is not limited to voiding contracts which 'on their face' violate the Exchange Act. *Id.* (*citing Reg'l Props. Inc.*, 678 F.2d at 560 ("A statute that voided only contracts by which persons have agreed in express terms to violate the Act would be so narrow as to be a waste of the congressional time spent in its enactment.")). "There is also no requirement that the contract's making or performance 'necessarily' required a

violation of the Exchange Act. Instead, a contract may be voidable under Section 29(b) if its performance in fact involved a violation of the Exchange Act." *Id.*

Some of the factors relevant to determining if a person acted as a broker-dealer within the meaning of the Exchange Act include: "whether that person 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors." *Hayden v. Urvan*, No. 21-82051-CIV-Smith, 2023 WL 6310892, *9 (S.D. Fla. July 24, 2023) (quoting *SEC v. Hansen*, No. 83 CIV. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984)); *see also SEC v. Collyard*, 861 F.3d 760, 766 (8th Cir. 2017) (quoting and adopting factors set forth in *SEC v. George*, 426 F.3d 786, 797 (6th Cir. 2005) (identifying factors as: "[1] regular participation in securities transactions, [2] employment with the issuer of the securities, [3] payment by commission as opposed to salary, [4] history of selling the securities of other issuers, [5] involvement in advice to investors and [6] active recruitment of investors.")).

There is no statutory exception to the broker-dealer registration requirement for "finders." *See Collyard*, 861 F.3d at 767. Likewise, the SEC, in its "no action letters" has never stated that there is a broad exemption from registration for

13

"finders." *Id*. Indeed, in one no-action letter dealing with similar broker-dealer activities, the SEC denied the request for a no-action determination. Brumberg, Mackey & Wall, P.L.C., SEC No-Action Letter, 2010 WL 1976174 (May 17, 2010) (noting that a person "receiving transaction-based compensation in connection with another person's purchase or sale of securities typically must register as a broker-dealer or be an associated person of a registered broker-dealer").

Here, there is no dispute that ICCT was in privity with PIGI, and that ICCT is among the class of persons intended to be protected by the securities acts. *See Eastside Church of Christ*, 391 F.2d at 362 (holding that issuer of bonds sold by unregistered broker was within the class of persons meant to be protected by Section 15(a)'s registration requirements). There also is no dispute that the Finder's Fee Documents each involved a "practice in violation of [the Exchange Act]" for purposes of 15 U.S.C. §§ 78o(a)(1), and 77cc(b). The Finder's Fee Documents all relate back to the original Finder's Fee Agreement, which clearly contemplated and required PIGI to "induce, or attempt to induce the purchase or sale of" ICCT's securities while PIGI was an unregistered broker. The Finder's Fee Agreement expressly contemplated that PIGI "will be providing information to ICCT relating to a proposed business combination transaction involving one or more companies," and that ICCT would pay PIGI a transaction based fee "in consideration for the introduction of the Transaction to ICCT by [PIGI] and [PIGI] assisting ICCT in

14

consummating an initial business combination with the Target" upon consummation of a Transaction (as defined therein). Finder's Fee Agreement, p. 1.

Consistent with the Finder's Fee Agreement, PIGI, acting through its agent, Wright, was actively involved in negotiations between ICCT, investors, and financing sources, and undertook the following activities (among other things):

- Marketing ICCT's equity and stock;
- Soliciting third parties for the purchase of or investment in ICCT's stock;
- Reviewing, editing, and providing advice and guidance to ICCT on the material transaction documents and agreements (including the Due Diligence Agreement and Business Combination Agreement);
- Negotiating, reviewing, and advising ICCT on term sheets for equity lines of credit, bridge notes, and warrants to purchase common stock of ICCT; and
- Facilitating, attending, and participating in negotiations between ICCT, investors, and financing sources regarding term sheets for equity lines of credit, bridge notes, and warrants to purchase common stock of ICCT;
- Advising ICCT on transaction deal terms and structure with respect to the Merger.

15

Perhaps most importantly, PIGI was not an employee of ICCT and seeks a commission or transaction-based compensation, as opposed to a salary or a flat fee. Finder's Fee Agreement, § 3. One of the "hallmarks of broker-dealer activity" for purposes of Section 15(a) of the Exchange Act is "receipt of transaction-based compensation in connection with" such activities. Brumberg, Mackey & Wall, P.L.C., SEC No-Action Letter, 2010 WL 1976174 (May 17, 2010) (citing *Order Exempting the Federal Reserve Bank of New York, Maiden Lane LLC and the Maiden Lane Commercial Mortgage Backed Securities Trust 2008-1 from Broker-Dealer Registration*, Exchange Act Release No. 61884 (Apr. 9, 2010) ("Indeed, the receipt of transaction based compensation often indicates that such a person is engaged in the business of effecting transactions in securities."); *see also* Letter from Catherine McGuire, Chief Counsel, Division of Market Regulation, to Thomas D. Giachetti, Stark & Stark, regarding 1st Global, Inc. (May 7, 2001) (reiterating the staff's position that "the receipt of securities commissions or other transaction related [sic] compensation is a key factor in determining whether a person or an entity is acting as a broker-dealer. Absent an exemption, an entity that receives commissions or other transaction-related compensation in connection with securities-based activities that fall within the definition of 'broker' or 'dealer'. . . generally is required to register as a broker-dealer." (internal citations omitted)).

16

For the foregoing reasons, the record evidence demonstrates that ICCT has a strong likelihood of success in proving that the Finder's Fee Agreement and PIGI's services rendered thereunder constitute broker-dealer activity that required registration under § 15(a) of the Exchange Act and Fla. Stat. § 517.12. And Because PIGI was never a registered broker-dealer with FINRA or the SEC, the Finder's Fee Agreement and all subsequent agreements related to the fee allegedly owed thereunder (i.e., the remaining Finder's Fee Documents) are voidable pursuant to § 29(b) of the Exchange Act and Fla. Stat. § 517.211(1). Plaintiffs' accordingly have shown a strong likelihood of success on Counts I and II of the Complaint.

### ii.    The Finder's Fee Documents are the product of fraud and should be rescinded.

Under Florida common law, the elements of fraudulent inducement are: "(1) a false statement of material fact; (2) the maker of the false statement knew or should have known of the falsity of the statement; (3) the maker intended that the false statement induce another's reliance; and (4) the other party justifiably relied on the false statement to its detriment." *Prieto v. Smook, Inc.*, 97 So. 3d 916, 917 (Fla. 4th DCA 2012) (quoting *Shakespeare Found., Inc. v. Jackson*, 61 So. 3d 1194, 1199 n. 1 (Fla. 1st DCA 2011) (internal quotations omitted)). Fraudulent inducement renders a contract voidable. *Levitan v. Dancaescu*, 347 So. 3d 485, 491 (Fla. 1st DCA 2022) (quoting *Mazzoni Farms, Inc. v. E.I. DuPont De Numours & Co.*, 761 So. 2d 306, 313 (Fla. 2000)). Accordingly, "Florida law provides for an election of remedies in

17

fraudulent inducement cases: rescission, whereby the party repudiates the transaction, or damages, whereby the party ratifies the contract." *Id.*

Likewise, under Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), it is unlawful to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe." *See* 17 C.F.R. § 240.10b-5. Similarly, under Section 517.301(1)(a), Fla. Stat., it is unlawful for a person to, directly or indirectly, "employ any artifice to defraud," use "any untrue statement of a material fact or any omission . . . [to] mislead[]," and to engage in any transaction . . . which operates or would operate as fraud or deceit upon a person" in connection with the sale of any investment or security. *See* 17 C.F.R. § 240.10b-5 (containing nearly identical language). Therefore, the elements of proof required for such claims are similar to fraudulent inducement. *Gemini Invs. III, L.P. v. Nunez*, 78 So. 3d 94, 97 (Fla. 3d DCA 2012).

Here, there are two fraudulent misrepresentations or omissions by Defendants. First, PIGI falsely represented and warranted to ICCT in the Finder's Fee Agreement that "it is a registered member of the Financial Industry Regulation Authority as of the date hereof." Finder's Fee Agreement, § 2. Contrary to this representation, PIGI has *never* been registered with FINRA or the SEC. Second, Defendants fraudulently omitted the material fact of Schneller's participation and entitlement to half of the

18

finder's fee under the Finder's Fee Agreement. ICCT reasonably relied on PIGI's representation that it was registered with FINRA, and reasonably believed that Schneller—who at that time was a Director of ICCT—would not stand to gain personally from the Finder's Fee Agreement. But for the misrepresentation and nondisclosure, ICCT would not have entered into the Finder's Fee Agreement.

As a Director of ICCT, Schneller had a fiduciary duty under Nevada law to advise ICCT's board of directors and officers of his conflict of interest and self-dealing transaction through the Finder's Fee Agreement. *See, e.g., Guzman v. Johnson*, 137 Nev. 126, 132, 483 P.3d 531, 537 (Nev. 2021) ("[A] plaintiff may rebut the business judgment rule's presumption of good faith by, for instance, showing that the fiduciary had a personal interest in the transaction . . . .") (citing *Wynn Resorts, Ltd. v. Eighth J. Dist. Ct.*, 133 Nev. 369, 377, 399 P.3d 334, 343 (Nev. 2017)). ICCT has introduced competent evidence establishing that Schneller never disclosed his side agreement with PIGI to share in the finder's fee, and that he in fact has such an agreement to receive 50% of the finder's fee. There is no question that Schneller had a fiduciary duty to disclose his interest in the finder's fee at the time he was advocating for ICCT to engage PIGI under the Finder's Fee Agreement, and that his failure to do so constitutes a breach of that duty. Accordingly, Schneller's material nondisclosure and PIGI's material misrepresentation to ICCT are

19

actionable, and give rise to claims for rescission (Counts III, IV, and V) for which ICCT has established a strong likelihood of success.

**B.      Plaintiff is likely to suffer irreparable harm in the absence of preliminary relief.**

Numerous district courts have found that the potential destruction of a business can constitute irreparable harm. *ABC Charters, Inc. v. Bronson,* 591 F. Supp. 2d 1272, 1308–09 (S.D. Fla. 2008) (finding plaintiffs demonstrated irreparable harm by establishing their businesses will be forced to close absent injunctive relief); *Blossom S., LLC v. Sebelius*, No. 13-CV-645L, 2013 WL 4679275, at *1 (W.D.N.Y. Aug. 30, 2013) ("The total destruction of a business has been held to constitute irreparable harm.") (citing *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 516 (Fed. Cir. 1990) (granting stay where "reasonably expected harm would be both catastrophic and irreparable" such that appellant "may well cease to exist"); *Oyster Technologies, Ltd. v. Env't Devs. Grp., LLC*, No. 11–CV–11795, 2011 WL 6213747, at *2 (D. Mass. Dec. 13, 2011) ("Where there is a risk of loss or destruction of a business entity, courts have held that injunctive relief is appropriate") (footnote and citations omitted).

Absent a temporary injunction, PIGI will sell all of ICCT's and ICCT Parent's respective assets[3] through the Auction scheduled to conclude on April 25, 2025.

---

[3] Although the marketing materials for the auction are far from clear, it appears that PIGI is attempting to sell the assets of both corporations, not just the assets of ICCT.

Such a sale would destroy Plaintiffs' businesses. It would cause a total loss of ICCT's business and goodwill, with no hope of recovery once the sale is complete. ICCT would lose its valuable intellectual property, including its software patents and trademarks. ICCT would also lose all of its customers and revenue streams, which would result in a complete shutdown of operations and the loss of 71 jobs for ICCT's employees. In sum, the scheduled Auction will be catastrophic for ICCT if it goes forward.

There is no way to accurately quantify with money damages the complete destruction of ICCT's business. ICCT stands to lose its unique and proprietary business assets, its name recognition, and its customer goodwill and relationships, none of which is capable of ready valuation. Under the authorities cited above, such complete destruction of a business constitutes irreparable harm.

### C.     The balance of equities is in Plaintiffs' favor.

"An injunction issues only if the prospective harm to the moving party from denying the injunction outweighs the harm to the non-moving party from enjoining specific conduct." *Kazal v. Price*, No. 8:17-cv-2945-T23AAS, 2017 WL 6270086, *3 (M.D. Fla. Dec. 8, 2017). Here, the complete destruction of ICCT's business far outweighs the harm to PIGI of (temporarily) delaying or stopping the Auction. Thus, the balance of equities favors an injunction.

### D.     The injunctive relief requested is in the public interest.

21

"When the reach of an injunction is narrow, limited only to the parties, and has no impact on non-parties, the public interest will be at most a neutral factor in the analysis rather than one that favors granting or denying the preliminary injunction." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1138–39 (9th Cir. 2009) (citation and internal alterations omitted). Here, the injunctive relief sought affects only PIGI's right to conduct the Auction and to otherwise enforce the Finder's Fee Documents. This factor is therefore neutral at worst.

However, an injunction will serve the public interest by upholding the Federal government's and the State of Florida's strong interest in protecting businesses and investors from fraudulent and unqualified intermediaries in securities transactions. This is the purpose of Florida's Blue Sky Laws and the Exchange Act. *See Arthur Young & Co. v. Mariner Corp.*, 630 So. 2d 1199, 1203 (Fla. 4th DCA 1994) ("The legislative purpose of the Florida Securities and Investor Protection Act was, as its title makes clear, to protect the public from fraudulent and deceptive practices in the sale and marketing of securities."); *SEC v. Comcoa Ltd.*, 887 F. Supp. 1521, 1524 (S.D. Fla. 1995) ("The principal purpose of the federal securities laws is to protect investors by requiring full disclosure of information material to investment decisions, by compensating defrauded investors, and by deterring fraud and manipulative practices."); *SEC v. Kramer*, 778 F. Supp. 2d 1320, 1334 (M.D. Fla. 2011) ("The broker-deal registration requirement is 'of the utmost importance in

effecting the purpose[] of the [Exchange Act] . . . .'" (alterations in original)). A preliminary injunction will further the public interest in ensuring compliance with state and federal broker-dealer registration requirements, and will discourage future violations. Permitting unregistered brokers to enforce illegal agreements incentivizes noncompliance with such laws.

Finally, the public interest weighs in favor of granting preliminary injunctive relief because there is "a clear public interest in maintaining the status quo." *Coastal Laboratories, Inc. v. Jolly*, Case No. RDB-20-2227, 2021 WL 1599224, *10 (D. Md. April 23, 2021) (*quoting Wachovia Ins. Servs., Inc. v. Hinds*, No. WDQ-07-2114, 2007 WL 6624661, at *9 (D. Md. Aug. 30, 2007)); *see also Maryland Undercoating Co. v. Pain*, 603 F.2d 477, 481 (4th Cir. 1979). "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be fully and fairly adjudicated." *Robinson v. Attorney General*, 957 F.3d 1171, 1178 (11th Cir. 2020) (*quoting Ne. Fla. Ch. of Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1284 (11th Cir. 1990)). Here, the status quo is that ICCT is a viable, operating company with valuable software and intellectual property rights that is owned and operated by ICCT Parent, which is a viable publicly traded company. A preliminary injunction will preserve the value and viability of Plaintiffs' businesses, and will not harm PIGI, while the merits of Plaintiffs' claims are adjudicated.

**E.      The Court should grant a TRO without notice to Defendants.**

A court may only issue a temporary restraining order without notice to the

adverse party or its attorney if:

> (A) specific facts in an affidavit or a verified complaint clearly show
> that immediate and irreparable injury, loss, or damage will result to the
> movant before the adverse party can be heard in opposition; and

> (B) the movant's attorney certifies in writing any efforts made to give
> notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1); *see also* Local Rule 6.01, United States District Court,

Middle District of Florida (requiring "a precise and verified description of the

conduct and the persons subject to restraint"). In support of its request for issuance

of a TRO without notice to PIGI, Plaintiffs have submitted the Verified Complaint

and the McDermott Declaration. In these documents, Plaintiffs have presented

evidence showing that irreparable harm will befall them if an immediate TRO is not

issued. In short, absent a TRO, the unlawful Auction of Plaintiffs' will continue to

go forward and conclude on April 26th, which will destroy ICCT's business entirely.

The verified allegations of the Complaint and the McDermott Declaration set

forth the reasons why notice should not be required in this case. The Auction is

already underway. PIGI has engaged Dealgen to run an online, sealed-bid auction of

all of Plaintiffs' respective assets. Initial bids are due by April 11, 2025, and final

bids are due April 25, 2025 at 8:00 p.m. EST. The successful bidder will be

designated and notified on April 26, 2025. Given the Auction is already underway

24

and bids have been solicited, it is important to stop the auction process as soon as possible to avoid a bidder claiming to be a bona fide purchaser and asserting ownership over Plaintiffs' assets. Thus, a TRO is necessary to stop the Auction immediately and preserve the status quo until the Court is able to conduct an evidentiary hearing to determine whether a more durable preliminary injunction is warranted. Under these circumstances, the time required to provide notice to PIGI and opportunity for a full evidentiary hearing is impractical. The Court should issue a TRO without notice, and then set an evidentiary hearing on ICCT's request for a preliminary injunction with notice to PIGI.

###    F.    The Court should require a minimal bond.

Federal Rule of Civil Procedure 65(c) requires that, "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Even though bonds are normally required, "it is well-established that the amount of security required by [Rule 65(c)] is a matter within the discretion of the trial court, and the court may elect to require no security at all." *TracFone Wireless, Inc. v. Wash.*, 978 F. Supp. 2d 1225, 1235 (M.D. Fla. 2013) (quoting *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs., LLC*, 425 F.3d 964, 971 (11th Cir. 2005)). Because the purpose of the bond is to protect against being "wrongfully

enjoined," where, as here, a party makes a strong showing of likelihood of success on the merits, the bond amount should be minimal. In addition, PIGI will suffer minimal or no damages in the event it is later determined that the injunction was improvidently granted because the requested injunction would only temporarily delay Defendant's sale of Plaintiffs' assets. Accordingly, Plaintiff submits that a bond in this case should be minimal and no more than $10,000.00.

WHEREFORE, Plaintiffs respectfully requests this Court enter an order granting this Motion and issuing a temporary restraining order, without notice to PIGI:

(i) enjoining Defendant, PIGI Solutions, LLC, and its agents, including Dealgen Partners, from conducting any further auction of ICCT's assets or ICCT Parent's assets, including the auction currently underway and scheduled to conclude on April 26, 2025, until such time as the Court renders its decision on Plaintiffs' request for a preliminary injunction;

(ii) enjoining Defendant, PIGI Solutions, LLC, from taking any other action to enforce the terms of the Finder's Fee Documents, except to seek relief or assert its rights in this action;

(iii) setting the amount of a bond required to be posted by Plaintiffs;

(iv) setting an evidentiary hearing on Plaintiffs' request for a preliminary injunction; and

(v) granting such other and further relief as this Court deems just and proper.

Respectfully submitted this 4th day of April, 2025.

*/s/ Christopher R. Thompson*
**Christopher R. Thompson, Esq.** (FBN: 0093102)
Primary: crthompson@burr.com
Secondary: mlucca-cruz@burr.com
**Kylie A. Riordan, Esq.** (FBN: 1058286)
Primary: kriordan@burr.com
Secondary: echaves@burr.com
**BURR & FORMAN LLP**
200 S. Orange Avenue, Suite 800
Orlando, FL 32801
T: (407) 540-6600 F: (407) 540-6601
*Attorneys for Plaintiff, iCoreConnect Inc.*

# EXHIBIT "A"

## IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

ICORE MIDCO INC., a
Nevada corporation; and
ICORECONNECT INC., a
Delaware corporation,

      Plaintiffs,

vs.                          CASE NO.

PIGI SOLUTIONS, LLC, a Delaware
limited liability company; and JOHN
SCHNELLER, an individual,

      Defendants.

_____/

## <u>DECLARATION OF ROBERT MCDERMOTT</u>

      Pursuant to 28 U.S.C. § 1746, I, Robert McDermott, declare under penalty of perjury that the following is true and correct:

      1.     I am President and Chief Executive Officer for Plaintiffs, iCore Midco Inc., a Nevada corporation ("<u>ICCT</u>"), and ICORECONNECT INC., a Delaware corporation ("<u>ICCT Parent</u>," and together with ICCT, the "<u>Plaintiffs</u>"), and I am older than eighteen (18) years of age. I have personal knowledge of the facts stated within this Declaration. If called as a witness, I could and would competently testify to these facts.

1

2.    I make this Declaration upon my review of Plaintiffs' business records related to the Finder's Fee Documents[1], and my knowledge of Plaintiffs' procedures for creating and maintaining these records.

3.    PIGI, acting through its agent, Peter Wright ("<u>Wright</u>"), actively solicited investors for ICCT in its performance of the Finder's Fee Agreement, including, but not limited to, the following activities:

   a.    Facilitating introductions between investors and key personnel of ICCT;

   b.    Reviewing, editing, and providing advice to ICCT for a model to present to investors; and

   c.    Reviewing, editing, and providing advice and guidance to ICCT on the Deck and Press Release for the Merger.

True and correct copies of certain emails (non-exhaustive) evidencing the above-referenced actions and communications are attached hereto as **<u>Composite Exhibit 1</u>**.

4.    PIGI, acting through its agent, Wright, advised investors as to the merits of an investment in ICCT.

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Verified Complaint.

5.     PIGI, acting through its agent, Wright, was actively involved in negotiations between ICCT, investors, and financing sources, including, but not limited to, the following:

d.     Reviewing and providing advice and guidance to ICCT on the Due Diligence Agreement, which outlined the terms and conditions under which buyers or investors were allowed to examine the financial, operational, and legal aspects of ICCT before finalizing a transaction;

e.     Reviewing and providing advice and guidance to ICCT on the Business Combination Agreement, which outlined the terms and conditions under which Target and ICCT agreed to combine their operations, assets, and liabilities;

f.     Negotiating, reviewing, and advising ICCT on term sheets for equity lines of credit, bridge notes, and warrants to purchase common stock of ICCT; and

g.     Facilitating, attending, and participating in negotiations between ICCT, investors, and financing sources regarding term sheets for equity lines of credit, bridge notes, and warrants to purchase common stock of ICCT.

True and correct copies of certain emails (non-exhaustive) evidencing the above-referenced actions and communications are attached hereto as **Composite Exhibit 2**.

6.    PIGI, acting through its agent, Wright, discussed the details of securities transactions, including details of the Merger, ICCT's financing goals and decisions, term sheets for equity lines of credit and bridge notes, and warrants to purchase common stock of ICCT with ICCT, investors, and financing sources. True and correct copies of certain emails (non-exhaustive) evidencing the above-referenced actions and communications are included in Composite Exhibit 2.

7.    PIGI, acting through its agent, Wright, recommended or designed financing methods to ICCT, including, but not limited to, equity lines of credit, bridge notes, and warrants to purchase common stock of ICCT.

8.    PIGI, acting through its agent, Wright, made investment recommendations to ICCT, which included, but are not limited to:

    a.    Recommending that ICCT go through a certain investment banking firm's checklist for exchange listing requirements and other deal closing conditions;

    b.    Recommending language to ICCT for term sheets submitted to ICCT by financing sources; and

      c.     Stating to ICCT that a certain term sheet, which PIGI negotiated, "is an unbelievably good deal."

True and correct copies of certain emails (non-exhaustive) evidencing the above-referenced actions and communications are attached hereto as **Composite Exhibit 3**.

9.     The sale of all of Plaintiffs' assets would completely destroy Plaintiffs' businesses as it would cause a total loss of ICCT and ICCT Parent's business and goodwill, with no hope of recovery once the sale is complete.

10.     If the winning bidder at the UCC Sale gains ownership of all of ICCT's assets, ICCT could lose its valuable intellectual property, including its software, patents, and trademarks, and all of its customers and revenue streams, which would result in a complete shutdown of operations and the loss of 71 jobs for ICCT's employees.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 4, 2025.

ICORE MIDCO INC., a Nevada corporation and ICORECONNECT INC., a Delaware corporation

*Robert McDermott*

By: _____
    Robert McDermott
Its:  President and Chief Executive Officer

5

**COMPOSITE EXHIBIT "1"**

**Loving, Lee**

| | |
|---|---|
| **From:** | Peter Wright <peter@intro-act.com> |
| **Sent:** | Wednesday, December 14, 2022 8:42 AM |
| **To:** | Robert McDermott |
| **Subject:** | Deck and PR |

Robert,

Here are some initial thoughts . . . I think we might be more efficient to walk through together . . .

<div style="background-color:green; text-align:center">Deck (first thoughts):</div>

Slide 4:
- what about the promote in sources/uses
- 12% cash "thereafter", isn't it only 1 year and then converts to common?
- Confirming only 1 reset at 12 months (no second reset)
- Duration of warrants and flag public/private

Slide 5 – qualitative, could make more quantitative
- What is size of addressable market (could take Market * subscription of industry) - $73/month = $1B market (how do you get to $75/month - acquisition) – another alternative is adding Canada and lowering monthly to ~$50-60/month
- What is incremental margin
- Value/subscription and its growth isn't shared

Slide 5 – Add subscription value (with breakdown if possible)

Slide 11 – is logo's accelerating Y/Y – if so breakdown by year

Slide 12 – What does an endorsement mean – similarly, could there be a positive story on Y/Y growth

Slide 16 – What are drivers of annualized sales, why is 2022 $8.9M??

Slide 17 – icons in black don't seem to match text

Slide 18 – what is pipeline look like now # deals and value?

<div style="background-color:green; text-align:center">Press Release (if Joint):</div>

**BULLETS**
- POINT 1 – What is iCoreConnect
- POINT 2 – Why Valuable / Strong Strategic Partnerships and Accelerated Adoption Validate
- POINT 3 – Why SPAC – capital to consolidate market
- POINT 4 – Transaction Details (value and proceeds) and timing

**Body**
- Complete – good quotes

1

**Transaction Details**

- The transaction is expected to deliver up to [$  ] million of gross proceeds to the combined company from the FGMC trust account from its initial public offering in February 2022, assuming no redemptions. All references to available cash from the trust account and retained transaction proceeds are subject to any redemptions by the public stockholders of FGMC and payment of transaction expenses. The transaction has no minimum cash condition.

- Existing FGMC shareholders who don't exercise their redemption rights will roll 100% of their equity into preferred stock of the combined company. The preferred stock will have a 12% coupon payable in cash or paid-in-kind for the first 12 months after the close of the transaction and cash thereafter. The initial conversion price from common stock to preferred stock will be at a conversion price of $10.00 per share. A reset to the lessor of $10 or 20% above the simple average volume weighted average price (VWAP) will occur 12 months after the closing of the transaction. The reset price can be no greater than $10.00 per share but no less than $2.00 per share.

- iCoreConnect common stock holders will receive common stock in the combined entity. The transaction, which has been unanimously approved by FGMC's board of directors and the independent members of iCoreConnect's board, is expected to close in the second quarter of 2023, and is subject to approval by FGMC's stockholders and iCoreConnect's stockholders and other customary closing conditions.

**Advisors:**

- Arent Fox Schiff LLP is serving as legal advisor to iCoreConnect. Loeb & Loeb LLP is serving as legal advisor to FG Merger Corp. Clarifying – no banker/advisors on either side?

**Investor Webcast Information**

- iCoreConnect and FGMC will host a joint investor webcast and conference call to discuss the proposed transaction on December 16, 2022, at 8:30 a.m. ET. A webcast will be available [here] and can also be accessed on [www.ir.icoreconnect.com] as well as on FG Merger Corp.'s website at www.fgmerger.com. For those of you who wish to participate by telephone, please dial [     ] (U.S.) or [     ] (International) and reference the [Conference ID ….]. A replay of the call will also be available via webcast at [www.ir.icoreconnect.com] or www.fgmerger.com. FGMC will file an investor presentation relating to the proposed transaction with the U.S. Securities and Exchange Commission (the "SEC") as an exhibit to a Current Report on Form 8-K prior to the call, which will be available on the SEC's website at www.sec.gov. All materials can also be found at www.fgmergercorp.com and at [www.ir.icoreconnect.com].

**About iCoreConnect**

- iCoreConnect, Inc. is a market leading, cloud-based software and technology company focused on increasing workflow productivity and customer profitability through its enterprise and healthcare workflow platform of applications and services. iCoreConnect is most notably known for its innovation in solving healthcare business problems. The company's philosophy places a high value on customer feedback, allowing iCoreConnect to respond to the market's needs. iCoreConnect touts a platform of 15 SaaS enterprise solutions and more than 90 agreements with state or regional healthcare associations across the U.S.

**About FG Merger**

- FG Merger Corp. is a Nasdaq-listed blank check company formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization similar business combination with one or more business.

**Important Information and Where to Find It**

- For additional information on the proposed transaction, see FG Merger Corp.'s Current Report on Form 8-K, which will be filed concurrently with this press release. In connection with the proposed transaction, the parties intend to file relevant materials with the Securities and Exchange Commission, including a registration

statement on Form S-4 to be filed by FG Merger Corp. with the SEC, which will include a proxy statement/prospectus of FG Merger Corp., and will file other documents regarding the proposed transaction with the SEC. FG Merger Corp.'s shareholders and other interested persons are advised to read, when available, the preliminary proxy statement/prospectus and the amendments thereto and the definitive proxy statement and documents incorporated by reference therein filed in connection with the proposed business combination, as these materials will contain important information about iCoreConnect, FG Merger Corp., and the proposed business combination. Promptly after the Form S-4 is declared effective by the SEC, FG Merger Corp. will mail the definitive proxy statement/prospectus and a proxy card to each shareholder entitled to vote at the meeting relating to the approval of the Business Combination and other proposals set forth in the proxy statement/prospectus. Before making any voting or investment decision, investors and stockholders of FG Merger Corp. are urged to carefully read the entire registration statement and proxy statement/prospectus, when they become available, and any other relevant documents filed with the SEC, as well as any amendments or supplements to these documents, because they will contain important information about the proposed transaction.

**Forward Looking Statement**
- In this news release, the use of the words "believe," "could," "expect," "may," "positioned," "project," "projected," "should," "will," "would," or similar expressions are intended to identify forward-looking statements that represent the Company's current judgment about possible future events. The Company believes these judgments are reasonable, but these statements are not guarantees of any events or financial results, and actual results may differ materially due to a variety of important factors.

**No Offer or Solicitation**
- This press release shall not constitute a solicitation of a proxy, consent, or authorization with respect to any securities or in respect of the proposed business combination. This press release shall also not constitute an offer to sell or the solicitation of an offer to buy any securities, nor shall there be any sale of securities in any states or jurisdictions in which such offer, solicitation, or sale would be unlawful prior to registration or qualification under the securities laws of any such jurisdiction. No offering of securities shall be made except by means of a prospectus meeting the requirements of Section 10 of the Securities Act of 1933, as amended, or an exemption therefrom.

**Contact**
- Joint or separate contacts for SPAC/ICCT

---

**From:** Robert McDermott <rmcdermott@icoreconnect.com>
**Sent:** Wednesday, December 14, 2022 2:15 AM
**To:** Peter Wright <peter@intro-act.com>
**Subject:** ICCT Investor Deck_12-12-22_v2 (004) (002).pptx

Peter,

Draft of investor deck for your review.

Thanks,


**Robert McDermott**
**President & CEO**

iCoreConnect

407.505.8934 mobile
888.810.7706 main
iCoreConnect.com

**Loving, Lee**

| | |
|---|---|
| **From:** | Peter Wright <peter@intro-act.com> |
| **Sent:** | Monday, May 30, 2022 9:57 AM |
| **To:** | John Schneller; Robert McDermott |
| **Subject:** | RE: Model |
| **Attachments:** | Copy of 2022_iCoreConnect_Forecast_18MM_ARR_JS_4.0.xlsx |

John,
Looks great – four changes:

- ? Row 58 - Commissions should feed to Row 38 (vs 37) – that was my mistake
- ? Row 59 - Marketing expense seems low at $71K (that could be the cost of participating/sponsoring 1 expo)
- ? Row 37 - Efficiency of sales will start to decline as markets get more saturated (# subscribers 33K in '22 / 60K in '23 / 100K in '24)
- ? Row 49 – cost of developer seems high in the out year?

- ? I think Sales and Mktg should be no less then 15%, and closer to ~20% of sales
- ? Changing nothing else then the 4 items above, EBITDA Margin goes to 48% **_exiting_** 2024 (perfect)
  - o Gross Profit     75%
  - o Sales & Mktg    15%
  - o G&A             18%
  - o Op Income       47%
  - o EBITDA          48%

Think that this looks great:

| | 2022 | 2023 | 2024 |
|---|---|---|---|
| Sales | $11M | $30M | $60M |
| EBITDA | $0.1M | $11M | $26M |

However, you took sales down in 2022 to $11M – what was the thinking there?

Warmest,
Peter

---

**From:** John Schneller <john.schneller2@gmail.com>
**Sent:** Monday, May 30, 2022 9:03 AM
**To:** Peter Wright <peter@intro-act.com>; Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** Model

Robert/Peter,
Per our discussion I have worked on the model in an effort to craft something more plausible to investors for the out years. I made the following changes which, of course, are subject to your (robert's) scrutiny and approval:

1) I started ramping the salesforce slightly more aggressively in 2022 and then very aggressively in 2023 and 2024. This was necessary to achieve the organic sales numbers we had discussed that would be palatable to SPAC holders. I also think in line with Robert's comment that fully capitalized, a salesforce and accompanying sales ramp is very realistic.

2) I modified the $/subscription. Please review but no radical changes were made.  Just maintained a ramp per Robert's comment that the new product introductions such as Huddle, Huddle+ etc...should push up the $/subscription/license over time.  Please review to be sure this is still realistic

3) I smoothed Hardware/Prof Services.  In the previous version this number went negative due to the construction of the model.  I altered the construction and slowly ramped the number based on a driver I added (E82...) to reflect the diminishing importance of low margin, non-ARR, but still present hardware and services.  The line may be important in the future in the event we make an acquisition that is hardware/service heavy before we take assets into the iCoreCloud.  It allows for an easy explanation that will not detract from the growth/margin expansion story..

4) I did nothing with inorganic sales but we should consider having a version that layers in our $15Mn + acquisition as that takes us close to the $50Mn sales number in 2023 if that's what we want to display and if realistic.  We should talk about this.

5) I REALLY ramped up developers starting as we exit 2022.  Fully capitalized we will likely add this almost as aggressively as we can find good people, I suspect.  I also increased the cost of a developer over time.  May be too aggressive.  Please review.

6) I increased sales force aggressively starting at the close of the year as we become fully capitalized.  Per Robert, the only thing holding back growth is sales.  So I assume we will be investing heavily in this function when we have more capital.  I also added a line that adds 50% incremental cost per salesperson as I assume these sales people will be FTEs and cost us various taxes and benefits.  If this line is unneeded I suggest we repurpose these costs to G&A or Marketing as both of these costs seemed low to me/Peter and should be modified (increased as a cost).

7) Net net, the overall effect my changes had was to REDUCE EBITDA to 48% in 2023 and 59% in 2024.

8) If we increase marketing costs which I believe is inevitable, that will further temper EBITDA as a % of sales and bring that line more in line with Peter's expectations.

Cheers,

John

--
John Schneller
M 917.225.8041
john.schneller2@gmail.com

**ATTACHMENT REDACTED/OMITTED**

# COMPOSITE EXHIBIT "2"

**Loving, Lee**

---

| | |
|---|---|
| **From:** | Peter Wright <peter@intro-act.com> |
| **Sent:** | Thursday, September 14, 2023 9:43 AM |
| **To:** | Evan Basile |
| **Cc:** | Robert McDermott |
| **Subject:** | RE: Any update on the acquisition capital? |

Evan,

Thanks for looking – your message is well received.  I think we need to go equity/convert for now – I have someone in mind and I know it isn't your core.  IF you have any convert guys – would love to work with you, but think of you as more standard debt guy, right?

Warmest,

Peter

---

**From:** Evan Basile <ebasile@primaryfinancialcorp.com>
**Sent:** Thursday, September 14, 2023 9:23 AM
**To:** Peter Wright <peter@intro-act.com>
**Cc:** Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** RE: Any update on the acquisition capital?

Hi Peter and Robert,

I have had a few lenders pass on this deal due to low available assets for collateral. Is there any Real Estate available?

Thanks,

### Evan Basile
***Vice President***
Primary Financial Corp
550 Township Line Rd
Blue Bell, PA 19422
**(c) 610-585-5280**
**(o) 267-462-4999**



---

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Friday, September 8, 2023 3:47 PM
**To:** Evan Basile <ebasile@primaryfinancialcorp.com>
**Cc:** Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** RE: Any update on the acquisition capital?

Thank you sir!

**From:** Evan Basile <ebasile@primaryfinancialcorp.com>
**Sent:** Friday, September 8, 2023 3:35 PM
**To:** Peter Wright <peter@intro-act.com>; Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** RE: Any update on the acquisition capital?

Hi Peter and Robert,

I have a few lenders looking at this one right now. I am hoping to have an initial update on Monday or Tuesday.

Thanks,

## Evan Basile
*Vice President*
Primary Financial Corp
550 Township Line Rd
Blue Bell, PA 19422
**(c) 610-585-5280**
**(o) 267-462-4999**



---

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Friday, September 8, 2023 3:29 PM
**To:** Evan Basile <ebasile@primaryfinancialcorp.com>; Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** Any update on the acquisition capital?

**Peter Wright**
Founder, President
**Intro-act**
phone: 617-671-5148
email: peter@intro-act.com
www.intro-act.com



**Loving, Lee**

| | |
|---|---|
| **From:** | Peter Wright <peter@intro-act.com> |
| **Sent:** | Wednesday, September 13, 2023 4:36 PM |
| **To:** | Robert McDermott |
| **Subject:** | Yorkville  - can we discuss? |

**From:** Ben Piggott <ben@efhuttonyafund.com>
**Sent:** Wednesday, September 13, 2023 12:30 PM
**To:** Peter Wright <peter@intro-act.com>
**Subject:** FW: icct

Pete see below and let me know what you think

**From:** Ben Piggott
**Sent:** Wednesday, September 13, 2023 12:29 PM
**To:** Michael Rosselli - Yorkville Advisors Global, LP (mrosselli@yorkvilleadvisors.com) <mrosselli@yorkvilleadvisors.com>
**Cc:** Sam Rosselli <srosselli@yorkvilleadvisors.com>
**Subject:** icct

Mike and Sam

I spoke with Peter – he's happy to review what we want to send over; sounds like Arena is in the mix as well; they originally talked about doing $8MM, $5MM funded at close and another $3MM funded upon registration – likely downside to this number

As a reference, the share count is 12.1MM, so the market cap is $70MM @ $5.75/share; cash flow breakeven excluding one-time spac expenses – still has about $2.5MM of deal fees to pay

Peter believes they want to consolidate the ELOC and convert under one umbrella

I would write up as follows:

$6MM convert (8.5% of current market cap)
- $3MM at close, $3MM upon effective registration
- $7 fixed price (20% premium)
- XX% discount on the variable (defer to you here)
- $1MM / month max to equitize baring permission from the company to do more

$40MM SEPA with $20MM accordion (solves for $60MM) – use of proceeds as they see fit; funded in $7MM tranches, pending full conversion of the above-mentioned instrument; fees waved so as not to be redundant with pre-existing instrument

Sam, if you want to drop this into the template we can then send it on to Pete and the company

Ben

1

**Loving, Lee**

| | |
|---|---|
| **From:** | Peter Wright <peter@intro-act.com> |
| **Sent:** | Wednesday, September 6, 2023 6:32 PM |
| **To:** | Ben Piggott; Troy Rillo; Michael Rosselli; Robert McDermott |
| **Subject:** | RE: iCoreConnect |

Robert,
Can you confirm that the warrants are in the S1, and if so what needs to change in the documentation to satisfy the 20% -- Ben and his team are on stand-by?

Warmest,
Peter

---

**From:** Ben Piggott <ben@efhuttonyafund.com>
**Sent:** Wednesday, September 6, 2023 5:48 PM
**To:** Peter Wright <peter@intro-act.com>; Troy Rillo <TRillo@yorkvilleadvisors.com>; Michael Rosselli <MRosselli@yorkvilleadvisors.com>; Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** RE: iCoreConnect

Hey Pete

Just looking for an update here – any assistance we can lend, particularly on the legal side, please don't hesitate.

---

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Wednesday, September 6, 2023 11:53 AM
**To:** Troy Rillo <TRillo@yorkvilleadvisors.com>; Michael Rosselli <MRosselli@yorkvilleadvisors.com>; Ben Piggott <ben@efhuttonyafund.com>; Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** RE: iCoreConnect

Troy,
Thank you for this intel – you are the lawyer, and better informed than me. This makes sense. I am looking to speak with Robert at ~1PM when he lands in CA and will be back in the next couple hours. Don't want to comment on stock, but it is holding up.
Warmest,
Peter

---

**From:** Troy Rillo <TRillo@yorkvilleadvisors.com>
**Sent:** Wednesday, September 6, 2023 8:57 AM
**To:** Peter Wright <peter@intro-act.com>; Michael Rosselli <MRosselli@yorkvilleadvisors.com>; Ben Piggott <ben@efhuttonyafund.com>; Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** Re: iCoreConnect

Peter – we have not heard of any limits relative to the public float. The 20% rule that likely comes into play – is a limit of 20% of outstanding shares on capital raises at prices lower than market prices. That should apply to each investor and not be aggregated … in other words, our deal should have a limit of no more than 20% of outstanding. Other investors should be subject to the same limit (i.e., 20% each).



**Troy Rillo, Esq.**
Partner

**Phone**: 908-906-5127
**Email**: trillo@yorkvilleadvisors.com

1012 Springfield Avenue
Mountainside, NJ 07092
**www.yorkvilleadvisors.com**

---

**From:** Peter Wright <peter@intro-act.com>
**Date:** Wednesday, September 6, 2023 at 8:27 AM
**To:** Michael Rosselli <MRosselli@yorkvilleadvisors.com>, Ben Piggott <ben@efhuttonyafund.com>, Robert McDermott <rmcdermott@icoreconnect.com>
**Cc:** Troy Rillo <TRillo@yorkvilleadvisors.com>
**Subject:** RE: iCoreConnect

Michael and Ben,
Lawyers came back and said that there was pushback (from NASDAQ) saying that incremental securities can't be more than 20% of float, which makes no sense to me so they are researching.  There is a $40M ELOC, your warrants and a $5-10M convert (price/volume dependent) that was going to take out all other debt.  Robert is on a plane to CA (already in air – landing ~1PM ET) – the S1 is still scheduled to get filed today and lawyers should be processing all paperwork per Robert's direction.  The issue is that we need definitive guidance on what are max amounts allowed.  You guys do this all the time – any advise is appreciated knowing you are investors, not lawyers.

Never seen limitations on an ELOC and seen much bigger ones than $40M on company the size of ICCT.  The convert and warrants together I think is the issue – again any advise is appreciated.

Warmest,
Peter

---

**From:** Michael Rosselli <MRosselli@yorkvilleadvisors.com>
**Sent:** Wednesday, September 6, 2023 7:41 AM
**To:** Ben Piggott <ben@efhuttonyafund.com>; Robert McDermott <rmcdermott@icoreconnect.com>; Peter Wright <peter@intro-act.com>
**Cc:** Troy Rillo <TRillo@yorkvilleadvisors.com>
**Subject:** RE: iCoreConnect

Hey guys. Understand this was timely to get in the S-1. Let us know update on any comments from review so can get signed up and included in S-1.

Thanks
Michael

---

**From:** Ben Piggott <ben@efhuttonyafund.com>
**Sent:** Tuesday, September 5, 2023 2:39 PM
**To:** Robert McDermott <rmcdermott@icoreconnect.com>; Peter Wright <peter@intro-act.com>
**Cc:** Michael Rosselli <MRosselli@yorkvilleadvisors.com>; Troy Rillo <TRillo@yorkvilleadvisors.com>
**Subject:** FW: iCoreConnect

Hi Robert,

Please find the attached deal documents for the 3MM warrants

Feel free to reach out if you have any questions

Ben

---

**From:** Michael Rosselli <MRosselli@yorkvilleadvisors.com>
**Sent:** Tuesday, September 5, 2023 2:34 PM
**To:** Ben Piggott <ben@efhuttonyafund.com>
**Cc:** Troy Rillo <TRillo@yorkvilleadvisors.com>
**Subject:** FW: iCoreConnect

Ben, can you forward to ICore and their counsel?

---

**From:** Troy Rillo <TRillo@yorkvilleadvisors.com>
**Sent:** Tuesday, September 5, 2023 2:33 PM
**To:** Michael Rosselli <MRosselli@yorkvilleadvisors.com>
**Cc:** Ben Piggott <bpiggott@efhuttonmerchantpartners.com>
**Subject:** iCoreConnect

Mike,

Because of the quick turnaround on this, I am attaching a few initial drafts for iCore:

1. One Warrant – for 1.0 million shares at $6.00
2. Registration Rights Agreement
3. Closing Statement

There will be a second Warrant – the one for 2.0 million shares at $7.00, which will be a carbon copy of the attached Warrant except for the pricing terms. It would be easier if the Company reviewed and commented on the initial Warrant. Then I can duplicate the form and insert the pricing terms for the second Warrant.

There will also be a SPA, which is being drafted now and will be sent to you shortly.

TR



**Troy Rillo, Esq.**
Partner

**Phone**: 908-906-5127
**Email**: trillo@yorkvilleadvisors.com

1012 Springfield Avenue
Mountainside, NJ 07092
http://www.yorkvilleadvisors.com

CONFIDENTIALITY NOTICE:
This e-mail message is intended only for the intended recipient(s). The email or its attachment(s) may contain documents which are PRIVILEGED, PROPRIETARY, CONFIDENTIAL and MATERIAL NON-PUBLIC INFORMATION. If you are

3

not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this e-mail and any attachment(s) is strictly prohibited. If you have received this e-mail in error, please immediately notify the sender by replying to this e-mail and delete the message and any attachment(s) from your system. This communication does not reflect an intention by the sender or the sender's client or principal to conduct a transaction or make any agreement by electronic means. Nothing contained in this message or in any attachment shall satisfy the requirements for writing, and nothing contained herein shall constitute a contract or electronic signature under the Electronic Signatures in Global and National Commerce Act, any version of the Uniform Electronic Transactions Act or any other statute governing electronic transactions.

### Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

### Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

### Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

**Loving, Lee**

---

| | |
|---|---|
| **From:** | Peter Wright <peter@intro-act.com> |
| **Sent:** | Tuesday, September 5, 2023 9:19 AM |
| **To:** | Ben  Piggott; Robert McDermott |
| **Subject:** | RE: Executed warrant agreemnt |
| **Attachments:** | ICCT -- Term Sheet (Warrant Agreement) Sept5_REVISED.pdf |

Robert,

This should suffice if you send this version to lawyers for final review.

Warmest,

Peter

---

**From:** Ben Piggott <ben@efhuttonyafund.com>
**Sent:** Tuesday, September 5, 2023 9:08 AM
**To:** Peter Wright <peter@intro-act.com>; Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** RE: Executed warrant agreemnt

---

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Tuesday, September 5, 2023 9:05 AM
**To:** Robert McDermott <rmcdermott@icoreconnect.com>; Ben Piggott <ben@efhuttonyafund.com>
**Subject:** RE: Executed warrant agreemnt

Robert and Ben,

Can you both respond with initials to the revised commitment period?

Warmest,

Peter

---

**From:** Robert McDermott <rmcdermott@icoreconnect.com>
**Sent:** Tuesday, September 5, 2023 9:02 AM
**To:** Ben Piggott <ben@efhuttonyafund.com>
**Cc:** Peter Wright <peter@intro-act.com>
**Subject:** Executed warrant agreemnt



**Robert McDermott**
President & CEO

☎ 407.505.8934 Direct
📞 888.810.7706 Main
🔗 **iCoreConnect.com**

Click here to contact Sales, Support & Accounting

1

**ATTACHMENT REDACTED/OMITTED**

**Loving, Lee**

---

| | |
|---|---|
| **From:** | Ben  Piggott <ben@efhuttonyafund.com> |
| **Sent:** | Monday, September 4, 2023 5:01 PM |
| **To:** | Peter Wright |
| **Cc:** | Robert McDermott; Michael Rosselli; David Gonzalez |
| **Subject:** | RE: EF Hutton YA Fund / ICCT Term Sheet |
| **Attachments:** | ICCT -- Term Sheet (Warrant Agreement) Sept 4 2023 v3.doc |

Hi Robert and Peter

Please find the amended term sheet as per my discussion with Peter.

Thank you

Ben

---

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Friday, September 1, 2023 9:05 PM
**To:** Ben Piggott <ben@efhuttonyafund.com>
**Cc:** Robert McDermott <rmcdermott@icoreconnect.com>; Michael Rosselli <MRosselli@yorkvilleadvisors.com>; David Gonzalez <DGonzalez@yorkvilleadvisors.com>
**Subject:** Re: EF Hutton YA Fund / ICCT Term Sheet

Thanks Ben!

Sent from my iPhone

> On Sep 1, 2023, at 8:17 PM, Ben Piggott <ben@efhuttonyafund.com> wrote:

> Hi Robert,

> Please find an amended and executed term sheet that is in line with the mechanics that I spoke about with Peter, and were reflected in to you. Please let me know what else you need from us in order to get this closed early next week

> Ben

>> **From:** Ben Piggott
>> **Sent:** Thursday, August 31, 2023 1:21 PM
>> **To:** Robert McDermott <rmcdermott@icoreconnect.com>
>> **Cc:** Peter Wright <peter@intro-act.com>; Michael Rosselli <MRosselli@yorkvilleadvisors.com>; David Gonzalez <DGonzalez@yorkvilleadvisors.com>
>> **Subject:** EF Hutton YA Fund / ICCT Term Sheet

>> Hi Robert

Thank you for taking the time to speak with Mike and I this morning. We discussed internally how we might be helpful in your funding goals and would like to present the attached term sheet. Please review at your convenience and feel free to follow up today or tomorrow. Congratulations again on the uplist.

Ben

Ben Piggott
General Partner
EF Hutton YA Fund
617 784 5462
<ICCT -- Term Sheet (Warrant Agreement) Sept 1 2023 v2.doc>

**ATTACHMENT REDACTED/OMITTED**

**Loving, Lee**

---

| | |
|---|---|
| **From:** | Yoav Stramer <YStramer@arenaco.com> |
| **Sent:** | Tuesday, June 27, 2023 9:01 PM |
| **To:** | Peter Wright |
| **Cc:** | Robert McDermott; Brian Coyne |
| **Subject:** | RE: Arena term sheet for ICCT |
| **Attachments:** | Arena (ICCT) - Convertible Note Term Sheet - 6.27.23.pdf; Arena (ICCT) - ELOC Term Sheet - 6.27.23.pdf |

Hi Robert & Peter – nice speaking with you today.  See both TS's attached.

Let me know if you have any questions, happy to walk through the process again tomorrow if you need any clarity.  Thank you.

Best,
Yoav

Yoav Stramer
Director, Corporate Securities
405 Lexington Ave, 59th Floor
New York, NY 10174
T: +1 (212) 752-2568| C: +1 (319) 400-8227
ystramer@arenaco.com
www.arenaco.com



---

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Tuesday, June 27, 2023 5:09 PM
**To:** Yoav Stramer <YStramer@arenaco.com>
**Cc:** Robert McDermott <rmcdermott@icoreconnect.com>; Brian Coyne <BCoyne@arenaco.com>
**Subject:** Re: Arena term sheet for ICCT

Can we do 5:20?  Robert and I are free

Sent from my iPhone


> On Jun 27, 2023, at 3:58 PM, Yoav Stramer <YStramer@arenaco.com> wrote:
>
> Are you free anytime in the next 20-25 min?
>
> Yoav Stramer
> Director, Corporate Securities
> 405 Lexington Ave, 59th Floor
> New York, NY 10174
> T: +1 (212) 752-2568| C: +1 (319) 400-8227
> ystramer@arenaco.com

www.arenaco.com

<image001.png>

___

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Tuesday, June 27, 2023 3:37 PM
**To:** Yoav Stramer <YStramer@arenaco.com>
**Cc:** Robert McDermott <rmcdermott@icoreconnect.com>; Brian Coyne <BCoyne@arenaco.com>
**Subject:** Re: Arena term sheet for ICCT

Thank you - can Robert and I have a quick call with you later today, should be quick?

Sent from my iPhone

> On Jun 27, 2023, at 1:31 PM, Yoav Stramer <YStramer@arenaco.com> wrote:
>
> See below in red
>
> Yoav Stramer
> Director, Corporate Securities
> 405 Lexington Ave, 59th Floor
> New York, NY 10174
> T: +1 (212) 752-2568| C: +1 (319) 400-8227
> ystramer@arenaco.com
> www.arenaco.com
>
> <image001.png>

___

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Tuesday, June 27, 2023 2:29 PM
**To:** Yoav Stramer <YStramer@arenaco.com>
**Cc:** Robert McDermott <rmcdermott@icoreconnect.com>; Brian Coyne <BCoyne@arenaco.com>
**Subject:** Re: Arena term sheet for ICCT

So only option on convert is to get #2 to subordinate to you?  Yes

Otherwise no convert, just ELOC with zero cash at close?  No convert for now, but could get something done shortly after business combination close.  ELOC for now, no cash advanced, if you take that and/or FSPA you end up trading like BENF.

Sent from my iPhone

> On Jun 27, 2023, at 1:27 PM, Yoav Stramer <YStramer@arenaco.com> wrote:
>
> My understanding is there are two senior debt securities – 1) $2mm TL, matures March '26.  2) $2.5mm Convert, matures March '24.

2

We don't want to be subordinate to #2, even if #1 was somewhat paid down.  We also would not want the proceeds of our capital to paying down debt vs. growing the business.

Yoav Stramer
Director, Corporate Securities
405 Lexington Ave, 59th Floor
New York, NY 10174
T: +1 (212) 752-2568| C: +1 (319) 400-8227
ystramer@arenaco.com
www.arenaco.com

<image001.png>

---

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Tuesday, June 27, 2023 2:23 PM
**To:** Yoav Stramer <YStramer@arenaco.com>
**Cc:** Robert McDermott <rmcdermott@icoreconnect.com>; Brian Coyne <BCoyne@arenaco.com>
**Subject:** Re: Arena term sheet for ICCT

Alternatively, could subordinate to $2.5m, but would need to use some of proceeds to pay off other ~$1.5m, right?

Sent from my iPhone


On Jun 27, 2023, at 1:18 PM, Yoav Stramer <YStramer@arenaco.com> wrote:


Hi Peter – good to hear from you.  Unfortunately, we cannot get Investment Committee approval to be subordinate to the $2.5mm convert.  We can only be subordinate to the TL and would need to be senior to the convert.  If this absolutely does not work, we should revisit shortly after the deSPAC business combination close i.e. when we have a better view on stock price / liquidity.

Happy to discuss our competitive differentiation with an ELOC, which we can get going on definitive documentation ASAP.  Thanks.

Best,
Yoav

Yoav Stramer
Director, Corporate Securities
405 Lexington Ave, 59th Floor
New York, NY 10174

3

T: +1 (212) 752-2568| C: +1 (319) 400-8227
ystramer@arenaco.com
www.arenaco.com

<image001.png>

---

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Tuesday, June 27, 2023 1:24 PM
**To:** Yoav Stramer <YStramer@arenaco.com>
**Cc:** Robert McDermott
<rmcdermott@icoreconnect.com>
**Subject:** Re: Arena term sheet for ICCT

Yoav,
Circling back - ICCT board approved to move forward with your term sheet (apologies for third version and delay), but now the Red herring is filed and deal looks final.  Could we get an updated term sheet and Robert will process immediately?  Keep in mind the one revision needed is the approval of $4m of debt subordination.  All other terms agreed to.  Let us know when is good to reconnect.
Warmest,
Peter

Sent from my iPhone

On May 25, 2023, at 4:48 AM, Yoav Stramer <YStramer@arenaco.com> wrote:

Hi Peter – let's hop on a call asap.  After signing two term sheets, feels like we're not being shown the full picture here.

See below for responses.

**Convertible Note**
1. ICCT currently trades OTC.  The deSPAC company should trade significantly more volume.  Even the smallest of float market cap deSPACs trade $150k+ daily, with some trading .  We could mutually agree to reduce the volume constraint at the time of second tranche.

4

2. The floor resets will likely get pushback from the exchange, but OK with removing the 6-month reset. The cash true-up for conversions below the floor should suffice.
    1. The short VWAP timeframe is to create a conversion price that is more often than not at a small discount to the current market price. A longer VWAP period may limit Arena's ability to convert small pieces and reduce the principal balance. We understand 1) impacting the stock beyond the small discount realizes a net loss for Arena  2) impacting the stock on any given day could hurt liquidity going forward.
3. First time I'm hearing about bridge investors, unless this is the $2.1mm Term Loan which we have included in our executed TS.
4. Don't understand re warrants. Standard in convertible notes and equity offerings.
5. Registration is easy.
6. Can waive $5mm additional capital raise requirement
7. Yes ELOC, as we signed that TS as well
8. Exclusivity is just to protect Arena from Company doing a similar deal with someone else. We can have that period terminate on the day of business combination close.

**ELOC**
1. Same answer to first question re Convertible Note.

2. ELOC = synthetic ATM i.e. we will generally not accumulate a position via ELOC Drawdowns.  Also, the shares outstanding will increase via conversion of our Convertible Note and ELOC drawdowns.
3. Don't understand re Commitment Shares
4. Same answer to first question re Convertible Note.

Yoav Stramer
Director, Corporate Securities
405 Lexington Ave, 59th Floor
New York, NY 10174
T: +1 (212) 752-2568| C: +1 (319) 400-8227
ystramer@arenaco.com
www.arenaco.com

<image001.png>

---

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Wednesday, May 24, 2023 9:32 PM
**To:** Yoav Stramer <YStramer@arenaco.com>
**Cc:** Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** Arena term sheet for ICCT

Yoav,
Robert and I are appreciative of your term sheet and are looking to process quickly.  Attached within are some points from our SPAC partner.  Most of the points we realized, specifically your capital is expensive and their might be some liquidity constraints on access (I don't expect much given existing shareholder base).  That said, there are some structural points that are unique on this deal with the preferred equity structure.  Can you take a look and either schedule a call to walk through, or provide us with responses to their concerns.  Much appreciation!

Warmest,
Peter

**Convertible Note**

1. How does the average daily turnover for ICCT today compare to the $500k trailing 30-day average for the second drawdown? If ICCT doesn't meet this requirement today, it might take a little work and time to get there pushing out the practical accessibility of the second drawdown.

2. Conversion Price is initially $9.25 but floats with the 3 lowest daily VWAPs on a 10-day trail with a floor that is 20% of 5-day VWAP with 3 resets at 6mo, 12mo and 18mo.

   1. Let's compare this to the extreme dilution scenario for the preferred. It has a floor of $2 that would only occur if the common is trading 12mo after the deal at a price of $1.67 or below for the 20-day VWAP. In that case, an equivalent $2.78mm amount of pref would be convertible into 1.56mm shares of common after including a PIK dividend. The Arena convertible note will reset the Floor to $0.33 and become convertible into 8.3mm shares. This will not be received well by pref holders and could precipitate the same terms into the preferred stock.

2. The reset at 6mo defeats the runway designed into the preferred to give iCore time to ramp up sales, investor relations, and show the market its valuation holds up.
3. The VWAPs are a very short timeframe and will expose this to extreme trading volatility in a negative way.

1. Our bridge investors won't subordinate or share position with Arena
2. The warrants described don't exist in our structure
3. Registration rights would need to be addressed
4. This requires a separate $5mm capital raise into common equity or as an unsecured 24-mo note
5. This requires iCore to also subscribe to the accompanying ELOC
6. There is a $100k penalty that appears would be triggered by our road show

**ELOC**
1. How does the Daily Value Traded for ICCT today compare to the 40% limitation in Drawdown amount?  Based on that how much would ICCT be able to draw today?
2. The Beneficial Ownership limitation of 4.99% may make this facility practically very small.  9.8mm shares * 4.99% * $10 = $4.89mm and is further limited by shares convertible into by the Note above

3. $600k Commitment Shares pricing mechanism doesn't seem to consider our structure

4. There is a $100k penalty that appears would be triggered by our road show

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete the message and any attachments.  See http://www.arenaco.com/email-disclosure on important confidentiality and the risks of electronic communication. If you cannot access these links, please notify us by reply message and we will send the contents to you.

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete the message and any attachments.  See http://www.arenaco.com/email-disclosure on important confidentiality and the risks of electronic communication. If you cannot access these links, please notify us by reply message and we will send the contents to you.

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete the message and any attachments.  See http://www.arenaco.com/email-disclosure on important confidentiality and the risks of electronic communication. If you cannot access these links, please notify us by reply message and we will send the contents to you.

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete the message and any attachments.  See http://www.arenaco.com/email-disclosure on important confidentiality and the risks of electronic communication. If you cannot access these links, please notify us by reply message and we will send the contents to you.

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete the message and any attachments.  See http://www.arenaco.com/email-disclosure on important confidentiality and the risks of electronic communication. If you cannot access these links, please notify us by reply message and we will send the contents to you.

This e-mail may contain confidential or privileged information. If you are not the intended recipient, please advise us immediately and delete the message and any attachments.  See http://www.arenaco.com/email-disclosure on important confidentiality and the risks of electronic communication. If you cannot access these links, please notify us by reply message and we will send the contents to you.

**ATTACHMENT REDACTED/OMITTED**

**Loving, Lee**

| | |
|---|---|
| **From:** | Peter Wright <peter@intro-act.com> |
| **Sent:** | Thursday, May 11, 2023 6:08 PM |
| **To:** | Robert McDermott |
| **Cc:** | Yoav Stramer |
| **Subject:** | Questions on Arena |

Robert,
I had Yoav help with replies ☺

Bridge Note

- Missing interest rate  Done on purpose, no interest, makes it easier for the Company cash needs.

- The conversion price date reset needs some explanation. Is it implying that at the rest date that is the rate to be used go forward for the next six months or is it just adding 20% more availability every six months?  This is just changing the floor price so 80% discount to current price every 6 months.  In case the stock trades below $2 and we decide to convert, which relieves the cash need to true us up (i.e. second paragraph in 'conversion price' section)

- Warrant coverage would be that they would have the ability to own about 18% of the fully diluted common stock post merger (2MM warrants plus approximately 8MM common stock on final conversion)  25% warrant coverage is quite standard.  The original warrants registered would only be tied to the initial $2.77mm tranche 1 funding.

- Redemption fee is excessive given that this note is convertible at the option of the holder  Early redemption would prevent us from being able to convert and with no cash interest rate need to create some economic return.  Also quite standard in these types of deals.

- 60 day exclusivity period is long to get the deal done  Can change to 30

- This is expensive money still around 18% cost of capital plus interest and warrants  The idea is that it has no cash expense, only converts into stock if ample liquidity, allows Company to execute on marketing/news flow to get stock up, etc.

ELOC

- We are initially going to issue up to 9,800,000 shares so the maximum we could borrow on this line is $20MM as they can only go up to 19.99% of the shares initially outstanding. We know that with the working capital adjustments and debt this number is less than 9.8MM shares so less than $20MM  Most important factor is the ELOC can be registered very quickly right out of the gates with no SEC review.  This allows the company to draw on the ELOC when there is potentially a very low float / stock could trade significantly higher.  Additionally, issuing more than 20% is a matter of a SH vote which can be done at any time in the future.  I wouldn't limit oneself.

- Given we have no volume experience our ability to draw may not be as high as we may need. We need to think of something here that allows us something  Happy to show you some liquidity analysis we have ran in the past, noting the difference between accessing primary exchange liquidity vs. dark pools (which our algos are customized to do very efficiently).

1

- The fact that they can takeaway this line with five days notice is not good – may affect our stock price if they did so – also very expensive if they pulled it within a year given we are giving them $600,000 worth of commitment shares  The term sheet is being misread.  The Company has the option to terminate within 5 days, or Arena and Company can mutually agree to terminate at any time.  Arena cannot unilaterally terminate.

**Loving, Lee**

| | |
|---|---|
| **From:** | Peter Wright <peter@intro-act.com> |
| **Sent:** | Tuesday, December 13, 2022 4:28 PM |
| **To:** | Robert McDermott |
| **Subject:** | RE: Draft BCA |

**Do you have:**

- Sources and Uses
- Cap Table including warrants
- How are shares to be created to incentivize non-redemption

- Lock-up Agreement

---

**From:** Robert McDermott <rmcdermott@icoreconnect.com>
**Sent:** Tuesday, December 13, 2022 9:43 AM
**To:** Peter Wright <peter@intro-act.com>
**Subject:** FW: Draft BCA

**Robert McDermott**
**President & CEO**



407.505.8934 mobile
888.810.7706 main
iCoreConnect.com

---

**From:** Ronelle C. Porter <rporter@loeb.com>
**Sent:** Tuesday, December 13, 2022 2:02 AM
**To:** Archit Shah <ashah@icoreconnect.com>; 'Wes Schrader' <wes@waveriderpartners.com>; 'Ryan Turner' <ryan@fundamentalglobal.com>; 'Emily Torres' <emily@fgfinancial.com>; Mitchell Nussbaum <mnussbaum@loeb.com>; Shahrooz Shahnavaz <sshahnavaz@loeb.com>; Janeane Ferrari <jferrari@loeb.com>; Patrick MacMurray <pmacmurray@loeb.com>; Joshua Rosenstock <jrosenstock@loeb.com>; 'Hassan Baqar' <hbaqar@sequoiafin.com>; 'Larry Swets' <lswets@itascafinancial.com>; 'Kyle Cerminara' <kyle@fundamentalglobal.com>; 'Sajjad Baqar' <sajjad@fgfinancial.com>; 'Mark Penway' <mark@fgfinancial.com>; 'Jeff Sutton' <jeff@fundamentalglobal.com>
**Cc:** 'Robert McDermott' <rmcdermott@icoreconnect.com>; 'De Martino, Ralph V.' <ralph.demartino@afslaw.com>; 'Pavri, Cavas S.' <cavas.pavri@afslaw.com>; 'Tipsord, Nick' <nick.tipsord@afslaw.com>; 'Carly Garrison' <cgarrison@icoreconnect.com>; 'David Fidanza' <dfidanza@icoreconnect.com>; 'Jeff Stellinga' <jstellinga@icoreconnect.com>; 'Murali Chakravarthi' <murali@icoreconnect.com>
**Subject:** RE: Draft BCA

iCore Team,

1

Attached please find a revised draft of the BCA.  In the interest of time we are sending the current draft to all parties simultaneously and as such it remains subject to our client's full review and comment.

In connection with our continued review, please provide a fully updated cap table showing all outstanding shares and convertible securities along with the terms of such securities (exercise price/number of underlying shares etc.).

Please let us know if you have any questions or would like to schedule a call to discuss once you have had an opportunity to review.

Thanks,
Ronelle

**Ronelle C. Porter**
*Partner and Assistant Deputy Chair, Capital Markets and Corporate*

345 Park Avenue | New York, NY 10154
**Direct Dial:** 212.407.4110 | **Fax:** 212.407.4990 | **E-mail:** rporter@loeb.com
**Los Angeles** | **New York** | **Chicago** | **Nashville** | **Washington, DC** | **San Francisco** | **Beijing** | **Hong Kong** | **www.loeb.com**

CONFIDENTIALITY NOTICE: This e-mail transmission, and any documents, files or previous e-mail messages attached to it may contain confidential information that is legally privileged. If you are not the intended recipient, or a person responsible for delivering it to the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of any of the information contained in or attached to this transmission is STRICTLY PROHIBITED. If you have received this transmission in error, please immediately notify the sender. Please destroy the original transmission and its attachments without reading or saving in any manner. Thank you, Loeb & Loeb LLP.

**Loving, Lee**

---

| | |
|---|---|
| **From:** | Peter Wright <peter@intro-act.com> |
| **Sent:** | Wednesday, December 7, 2022 11:14 PM |
| **To:** | Robert McDermott |
| **Subject:** | RE: DA - with daves edits |

Robert,

I was able to look through the agreement.  This is a great legal framework, but the key points are still missing:

- Minimum cash
- Break-up fees
- Lock-up provisions
- Board make-up (seats)
- ESOP

I am of no help on the legalese but once key terms are established, I would love to take a second look.

Warmest,
Peter

---

**From:** Robert McDermott <rmcdermott@icoreconnect.com>
**Sent:** Wednesday, December 7, 2022 9:27 PM
**To:** Peter Wright <peter@intro-act.com>
**Subject:** Fwd: DA - with daves edits

---------- Forwarded message ---------
From: **David Fidanza** <dfidanza@icoreconnect.com>
Date: Wed, Dec 7, 2022, 9:03 PM
Subject: Fwd: DA - with daves edits
To: Robert McDermott <rmcdermott@icoreconnect.com>

---------- Forwarded message ---------
From: **David Fidanza** <dfidanza@icoreconnect.com>
Date: Wed, Dec 7, 2022 at 8:58 PM
Subject: DA - with daves edits
To: Archit Shah <ashah@icoreconnect.com>

--

1



**David Fidanza**
Chief Information Officer

☎ 888.810.7706 ext. 1052
🔗 **iCoreConnect.com**

Click here to contact Sales, Support & Accounting

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

--

Dave Fidanza
iCoreConnect Inc

**COMPOSITE EXHIBIT "3"**

**Loving, Lee**

| | |
|---|---|
| **From:** | Peter Wright <peter@intro-act.com> |
| **Sent:** | Thursday, September 14, 2023 1:03 PM |
| **To:** | Robert McDermott |
| **Subject:** | FW: ICCT term sheet |
| **Attachments:** | ICCT - SEPA^LMPre-Paid Advance Term Sheet 091423.v2.docx |

Robert,
This is an unbelievably good deal ☺

---

**From:** Ben Piggott <ben@efhuttonyafund.com>
**Sent:** Thursday, September 14, 2023 12:48 PM
**To:** Peter Wright <peter@intro-act.com>
**Cc:** Michael Rosselli - Yorkville Advisors Global, LP (mrosselli@yorkvilleadvisors.com) <mrosselli@yorkvilleadvisors.com>; Sam Rosselli <srosselli@yorkvilleadvisors.com>
**Subject:** ICCT term sheet

Peter,

This term sheet reflects the changes that we spoke and is ready to share with Robert with ICCT at the timing you see best fit. Mike and I are both available this afternoon if Robert has any follow up questions.

We are excited about the prospect of partnering with Robert and his team

Ben

**ATTACHMENT REDACTED/OMITTED**

**Loving, Lee**

---

| | |
|---|---|
| **From:** | Robert McDermott <rmcdermott@icoreconnect.com> |
| **Sent:** | Monday, August 14, 2023 12:18 PM |
| **To:** | Peter Wright; Vik Mittal |
| **Cc:** | Henry Rogano |
| **Subject:** | RE: CONFIDENTIAL: Follow-up -- Re: FG Merger/iCoreConnect <> Meteora Capital |

Hi Vik,

Thank you for the follow-up. Peter laid out below what is going on in a fairly concise manner.

I wanted to go with you guys but was pushed toward FGMC's contact. I appreciate the speed and straightforward manner in which you and Henry both displayed with all communications. I have you guys on speed dial if anything changes. Looking forward to working with you soon.

Best regards,



**Robert McDermott**
President & CEO

 407.505.8934 Direct
 888.810.7706 Main
 **iCoreConnect.com**

Click here to contact Sales, Support & Accounting

---

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Sunday, August 13, 2023 7:50 PM
**To:** Vik Mittal <vik@meteoracapital.com>
**Cc:** Henry Rogano <henry@meteoracapital.com>; Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** Re: CONFIDENTIAL: Follow-up -- Re: FG Merger/iCoreConnect <> Meteora Capital

You guys are truly great partners!!

Sent from my iPhone

> On Aug 13, 2023, at 7:30 PM, Vik Mittal <vik@meteoracapital.com> wrote:
>
> Hey thanks for update Peter! This one sounds pretty attractive with $5M upfront vs $3M from us so I'd want the Company to take the best terms available...this is a good outcome. If anything falls through, please rest assured we are here to help and can revisit next week.
>
> Really appreciate you keeping us in the loop! Thx Vik

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Sunday, August 13, 2023 7:14 PM

1

**To:** Vik Mittal <vik@meteoracapital.com>
**Cc:** Henry Rogano <henry@meteoracapital.com>
**Subject:** CONFIDENTIAL: Follow-up -- Re: FG Merger/iCoreConnect <> Meteora Capital

Vik,

I just heard on a 6PM update call with Robert @ ICCT that FGMC is in discussions with RiverNorth about two possibilities $15M FPA ($5M staying and $10M FPA or $15M FPA), which supposedly has better terms.  The issue is that your FPA still might be more attractive (even if terms are more expensive than RiverNorth) anyway because the SPAC gets credit for RiverNorth and if they get to $20M then their promote is in preferred, instead of common stock.  I asked Robert to reach out to you, return your email and update you.  He said he would tonight, but I wanted to make sure I shared as quick as I could.

Let me know if you want any further update from me.


Warmest,
Peter


**From:** Vik Mittal <vik@meteoracapital.com>
**Sent:** Sunday, August 13, 2023 1:20 PM
**To:** Peter Wright <peter@intro-act.com>
**Cc:** Henry Rogano <henry@meteoracapital.com>; Archit Shah <ashah@icoreconnect.com>; Robert McDermott <rmcdermott@icoreconnect.com>
**Subject:** Follow-up -- Re: FG Merger/iCoreConnect <> Meteora Capital

Hi Archit, Robert, Peter -

I removed the FG team as Wes has gone MIA on us and not sure what to make of it after he was calling me non-stop for weeks on end multiple times. Odd to say the least.

Bottomline, we'd love to work with you guys and let us know where we can be helpful. I know you are in a tough spot with a Sponsor that may not be focused on getting capital to you guys best but we do think the combo of FPA that brings cash + ELOC with a cash advance + Convert post closing puts the Company on a great footing from a capital base perspective post closing if FG is unable to bring the $5-10M capital we had discussed at closing.

Always available to chat, +1 917 887 5990.

Regards,
Vik


**From:** Vik Mittal <vik@meteoracapital.com>
**Sent:** Thursday, August 10, 2023 12:54 PM
**To:** Wes Schrader <wes@waveriderpartners.com>
**Cc:** Henry Rogano <henry@meteoracapital.com>; Archit Shah <ashah@icoreconnect.com>; Robert McDermott <rmcdermott@icoreconnect.com>; Larry Swets <lswets@itascafinancial.com>; Kyle Cerminara <kyle@fundamentalglobal.com>
**Subject:** Re: FG Merger/iCoreConnect <> Meteora Capital

Hey Wes & Team - following up here. Available to discuss as needed as you work through with advisors/counsel on next steps.

Regards,
Vik

---

**From:** Wes Schrader <wes@waveriderpartners.com>
**Sent:** Tuesday, August 8, 2023 11:40 PM
**To:** Vik Mittal <vik@meteoracapital.com>
**Cc:** Henry Rogano <henry@meteoracapital.com>; Archit Shah <ashah@icoreconnect.com>; Robert McDermott <rmcdermott@icoreconnect.com>; Larry Swets <lswets@itascafinancial.com>; Kyle Cerminara <kyle@fundamentalglobal.com>
**Subject:** Re: FG Merger/iCoreConnect <> Meteora Capital

Thanks, Vik.

Wes Schrader
Managing Partner, Waverider Partners
M: (303) 396-8751

On Aug 8, 2023, at 21:37, Vik Mittal <vik@meteoracapital.com> wrote:

Wes,

Thank you for the call earlier. It was productive to discuss the open items.

All - Please find attached a revised indicative term sheet that we believe incorporates the discussion points and committee feedback on our side. As a material benefit, we have waived any incentive shares/preferred stock to be issued to non-redeeming shareholders. We have adjusted the maturity consideration lower, *below our cost of capital in a SOFR + 75bps funding environment (~6.5%)*, and maintained $3M funding at close and increased future funding available to the company to $1.5M and $1.5M thereafter. For our certainty to ensure the Company is well capitalized we have included a $5M outside cash funding condition.

Please let us know if these terms are acceptable and we can sign a side letter to expedite the engagement of counsel so we are in a position to execute documentation by end of this week with a goal of disclosure Monday at the latest.

Regards,
Vik

---

**From:** Vik Mittal <vik@meteoracapital.com>
**Sent:** Tuesday, August 8, 2023 6:56 PM
**To:** Wes Schrader <wes@waveriderpartners.com>; Henry Rogano <henry@meteoracapital.com>
**Cc:** Archit Shah <ashah@icoreconnect.com>; Robert McDermott <rmcdermott@icoreconnect.com>; Larry Swets <lswets@itascafinancial.com>; Kyle Cerminara <kyle@fundamentalglobal.com>
**Subject:** Re: FG Merger/iCoreConnect <> Meteora Capital

Hi Wes & Team -

Working through an updated term sheet. As we refine the term sheet --- what would help us greatly would be a better understanding of the total cash raise expected at closing of the deal in coming weeks -- whether be non-redemption agreements, ELOCs, converts, etc.

We want to ensure the Company is well capitalized beyond the $3M ($1.00 x 3M shares) at closing.

Regards,
Vik

---

**From:** Wes Schrader <wes@waveriderpartners.com>
**Sent:** Tuesday, August 8, 2023 1:57 PM
**To:** Henry Rogano <henry@meteoracapital.com>; Vik Mittal <vik@meteoracapital.com>
**Cc:** Archit Shah <ashah@icoreconnect.com>; Robert McDermott <rmcdermott@icoreconnect.com>; Larry Swets <lswets@itascafinancial.com>; Kyle Cerminara <kyle@fundamentalglobal.com>
**Subject:** Re: FG Merger/iCoreConnect <> Meteora Capital

Thank you.  Does 5pm ET work for you?

Wes Schrader
Managing Partner, Waverider Partners
303-396-8751

---

**From:** Henry Rogano <henry@meteoracapital.com>
**Sent:** Tuesday, August 8, 2023 11:10
**To:** Vik Mittal <vik@meteoracapital.com>; Wes Schrader <wes@waveriderpartners.com>
**Cc:** Archit Shah <ashah@icoreconnect.com>; Robert McDermott <rmcdermott@icoreconnect.com>; Larry Swets <lswets@itascafinancial.com>; Kyle Cerminara <kyle@fundamentalglobal.com>
**Subject:** RE: FG Merger/iCoreConnect <> Meteora Capital

Hi Wes & team – thanks again for your time & feedback to date.

Please see attached high-level overview of a potential structure that you may find attractive. We would welcome the opportunity to discuss the mechanics in more detail at your convenience; please let us know when best.

Thanks!
Henry

---

**From:** Henry Rogano
**Sent:** Monday, August 7, 2023 3:14 PM
**To:** Vik Mittal <vik@meteoracapital.com>; Wes Schrader <wes@waveriderpartners.com>
**Cc:** Archit Shah <ashah@icoreconnect.com>; Robert McDermott <rmcdermott@icoreconnect.com>; Larry Swets <lswets@itascafinancial.com>; Kyle Cerminara <kyle@fundamentalglobal.com>
**Subject:** RE: FG Merger/iCoreConnect <> Meteora Capital

That works – I will send a Zoom …

4

**From:** Vik Mittal <vik@meteoracapital.com>
**Sent:** Monday, August 7, 2023 3:07 PM
**To:** Wes Schrader <wes@waveriderpartners.com>; Henry Rogano <henry@meteoracapital.com>
**Cc:** Archit Shah <ashah@icoreconnect.com>; Robert McDermott <rmcdermott@icoreconnect.com>;
Larry Swets <lswets@itascafinancial.com>; Kyle Cerminara <kyle@fundamentalglobal.com>
**Subject:** Re: FG Merger/iCoreConnect <> Meteora Capital

I'm in transit but can dial in - @Henry Rogano are you available at 5pm ET?

---

**From:** Wes Schrader <wes@waveriderpartners.com>
**Sent:** Monday, August 7, 2023 3:03 PM
**To:** Henry Rogano <henry@meteoracapital.com>
**Cc:** Vik Mittal <vik@meteoracapital.com>; Archit Shah <ashah@icoreconnect.com>; Robert McDermott
<rmcdermott@icoreconnect.com>; Larry Swets <lswets@itascafinancial.com>; Kyle Cerminara
<kyle@fundamentalglobal.com>
**Subject:** Re: FG Merger/iCoreConnect <> Meteora Capital

Hi - do you have availability later today?
Thanks,
Wes

Wes Schrader
Managing Partner, Waverider Partners
M: (303) 396-8751

On Aug 7, 2023, at 12:47, Henry Rogano <henry@meteoracapital.com> wrote:


Hi all – hope you had a good weekend …

Meteora remains excited to continue the collaborative discussion on potential financing solutions for
your imminent closing. Shall we all have a call this week to continue the discussion? How does
tomorrow look for you?

We want to send you some sort of term sheet/sketch ASAP, but want to run through a few final
questions ahead of doing so.

Thanks & all the best,
Henry
<Meteora Capital - FSPA Overview (FG Merger x ICC) 08.08.2023 pdf update1.pdf>

**Loving, Lee**

**From:**          Peter Wright <peter@intro-act.com>
**Sent:**          Thursday, July 6, 2023 6:09 AM
**To:**            Robert McDermott
**Subject:**       Re: raise


Think it is perfect, or at f you want to add one phrase -


(i) if Transaction, specifically effort to raising bridge capital ahead of the planned de-SPAC, is consummated during the period that Pickwick is engaged by the Company and that is initiated by Pickwick, the Company shall pay to Pickwick a success fee equivalent to 6% (the "Success Fee") of the aggregate Transaction Value, immediately hereafter defined.


Sent from my iPhone


On Jul 6, 2023, at 2:35 AM, Robert McDermott <rmcdermott@icoreconnect.com> wrote:


Peter,

Do you think this language is sufficient regarding Marks deal.  If you need clarity on what I am trying to accomplish, give me a call.

(i) if a Transaction is consummated during the period that Pickwick is engaged by the Company and that is initiated by Pickwick, the Company shall pay to Pickwick a success fee equivalent to 6% (the "Success Fee") of the aggregate Transaction Value, immediately hereafter defined.



**Robert McDermott**
President & CEO

☎ 407.505.8934 Direct
✆ 888.810.7706 Main
🔗 iCoreConnect.com

Click here to contact Sales, Support & Accounting

**Loving, Lee**

---

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Tuesday, April 18, 2023 8:17 AM
**To:** Jesse Busch; Robert McDermott
**Subject:** Re: ICCT SPAC Merger

Robert,
Reintroducing you to Jesse from I-Bankers.  Can we set a time to connect - there are many services at the end of the transaction that ibankers specializes.  Some don't apply given you are an uplisting.  However, think it would be very valuable to go through their checklist.  Can you recommend a couple times this week?
Warmest,
Peter

Sent from my iPhone


> On Apr 18, 2023, at 8:09 AM, Jesse Busch <jesse.busch@ibsgroup.net> wrote:
>
>
> Sure thing – as they've made progress on the deal I'm sure there are some items involved in deal closing that we can be helpful with.
>
> Thanks
>
> -
> Jesse Busch, CFA
> *631.786.7732*
> *Jesse.busch@ibsgroup.net*

**From:** Peter Wright <peter@intro-act.com>
**Sent:** Monday, April 17, 2023 11:08 PM
**To:** Jesse Busch <jesse.busch@ibsgroup.net>
**Subject:** Re: ICCT SPAC Merger

Robert McDermott is the CEO, can I make an intro?

Sent from my iPhone


> On Apr 17, 2023, at 4:53 PM, Jesse Busch <jesse.busch@ibsgroup.net> wrote:
>
>
> Got a kickback from John's email
>
>
> -
> Jesse Busch, CFA
> *631.786.7732*
> *Jesse.busch@ibsgroup.net*

**From:** Jesse Busch
**Sent:** Monday, April 17, 2023 4:45 PM
**To:** 'jschneller@icoreconnect.com' <jschneller@icoreconnect.com>
**Cc:** 'Peter Wright' <peter@intro-act.com>
**Subject:** ICCT SPAC Merger

Hi John – hope you're doing well. Just saw the first merger proxy filing, congrats on the progress! We (I-Bankers) have been involved in 15+ deSPAC closings year to date (majority of which we were brought into after deal announcements) to assist with various exchange listing requirements and other deal closing conditions. As such, figured it was worth touching base as you move closer to a potential merger.

Would be curious to learn how everything is progressing and figure out if we can be additive to the process. Happy to catch-up at your convenience.


Best,
Jesse

-
**Jesse Busch, CFA**
*I-Bankers Securities, Inc.*
*1261 Post Road, Suite 202A*
*Fairfield, CT 06824*
*631.786.7732*
Jesse.busch@ibsgroup.net


THIS MESSAGE IS CAPTURED AND ARCHIVED BY GLOBAL RELAY. This message is only for use by the intended recipient and may contain information that is privileged and/or confidential. If you are not the intended recipient, then any review, dissemination, replication or distribution is strictly prohibited. If you have received this communication in error, please notify us immediately and delete this message and all attachments. Any attachment that was not prepared by IBS has been unaltered, and is in its original form. Any recommendation, opinion or advice regarding securities or markets contained in any documentation that was not prepared by IBS does not necessarily reflect the views of IBS. The information contained herein is deemed to be reliable but is in no way warranted by IBS. Messages are monitored and retained by us, but we cannot guarantee the security of this message. IBS and its associates may not accept orders to purchase or sell securities via e-mail. IBS and/or its employees or affiliates may have an interest to trade in the securities discussed. IBS Group ("IBS") is representative of IBS Holding Corporation d.b.a. I-Bankers Securities, Inc. (member of FINRA & SIPC) and I-Bankers Direct, LLC (an affiliate). The sender of this email may be a representative of I-Bankers Securities, Inc. and I-Bankers Direct, LLC.

CAUTION: This email originated from outside our organization. DO NOT CLICK links or open attachments unless you recognize the sender and know the content is safe.

THIS MESSAGE IS CAPTURED AND ARCHIVED BY GLOBAL RELAY. This message is only for use by the intended recipient and may contain information that is privileged and/or confidential. If you are not the intended recipient, then any review, dissemination, replication or distribution is strictly prohibited. If you have received this communication in error, please notify us immediately and delete this message and all attachments. Any attachment that was not prepared by IBS has been unaltered, and is in its original form. Any recommendation, opinion or advice regarding securities or markets contained in any documentation that was not prepared by IBS does not necessarily reflect the views of IBS. The information contained herein is deemed to

be reliable but is in no way warranted by IBS. Messages are monitored and retained by us, but we cannot guarantee the security of this message. IBS and its associates may not accept orders to purchase or sell securities via e-mail. IBS and/or its employees or affiliates may have an interest to trade in the securities discussed. IBS Group ("IBS") is representative of IBS Holding Corporation d.b.a. I-Bankers Securities, Inc. (member of FINRA & SIPC) and I-Bankers Direct, LLC (an affiliate). The sender of this email may be a representative of I-Bankers Securities, Inc. and I-Bankers Direct, LLC.

**Loving, Lee**

| | |
|---|---|
| **From:** | Peter Wright <peter@intro-act.com> |
| **Sent:** | Thursday, February 16, 2023 2:09 PM |
| **To:** | dcooper@c6cap.com |
| **Cc:** | Robert McDermott |
| **Subject:** | This is me - looking to connect you with Robert McDermott (ICCT) |

Thanks for taking call – eager to see term sheet.
Warmest,
Peter

**Peter Wright**
Founder, President
**Intro-act**
phone: 617-671-5148
email: peter@intro-act.com
www.intro-act.com

